Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John A. Nordberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 02 C 5126 | DATE | 3/1/2004 |
| CASE TITLE | Sandra A. Hillock vs. Continental Casualty Company | | |

MOTION: [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter memorandum opinion and order. For the foregoing reasons, plaintiff's cross-motion for summary judgment is granted and defendant's cross-motion for summary judgment is denied. The parties are directed to appear at a status hearing on March 24, 2004 to determine how to resolve the remaining issues so that a final judgment may be entered. (9-1,2 6-1)

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | MAR 0 2 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | JXM | 20 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT CLERK | | |
| TP | courtroom deputy's initials | '04 FEB 30 PM 5:00 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SANDRA A. HILLOCK, | ) | |
| | ) | **DOCKETED** |
| Plaintiff, | ) | |
| | ) | MAR - 2 2004 |
| | ) | |
| | ) | No. 02 C 5126 |
| v. | ) | |
| | ) | Judge John A. Nordberg |
| | ) | |
| CONTINENTAL CASUALTY COMPANY, | ) | |
| a CNA Company | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This is an ERISA case challenging an administrator's decision to deny long-term disability benefits. Before the court are cross-motions for summary judgment. For the reasons set forth below, we grant summary judgment in favor of plaintiff Sandra A. Hillock and against defendant Continental Casualty Company, a CNA Company ("CNA").

### BACKGROUND[1]

In 1997, Sandra Hillock began working for CF Industries, Inc. ("CF Industries"). As an employee, she was a participant in her employer's disability income insurance policy underwritten by CNA (Policy No. SR-83078179).[2]

---

[1]The following facts are undisputed and are taken from the administrative record.

[2]This policy constituted an "employee welfare benefit plan" as defined by 29 U.S.C. § 1002(1), and Hillock was a "participant" as defined by 29 U.S.C. § 1002(7).

-1-



In May of 1999, Hillock was in a car accident and injured her back. An MRI taken after the accident revealed a herniated disk at C3-4, canal and foraminal narrowing at C4-5, C5-6, and C6-7 and disc protrusions at the T1-2 level. (R 154.)[3] Hillock had surgery to correct these problems. But the surgery did not eliminate her symptoms as she continued to experience numbness in her hands, pain her neck, bodily pain, sleep disruptions, and other problems.

On February 3, 2000, Hillock underwent a second surgery to alleviate the ongoing pain. Dr. Russell Nockles performed anterior C5-6 and C6-7 microdiskectomy and fusion surgery. In a follow-up visit to Dr. Nockles' office four months later, Hillock indicated that she still experienced fatigue, soreness, and low back pain that was not relieved by Tylenol. (R 106.) On December 27, 2000, another MRI was taken, which indicated that Hillock still suffered from damage to her spine.[4]

Based on these problems and the continuing pain, Hillock's primary care physician, Dr. Erin Davis, advised her to quit working. Following this advice, she stopped working on February 27, 2001. At the time, she was 56 years old and was making approximately $3,071.20 a month.

---

[3]Even before this accident, Hillock had experienced some spinal degeneration. (R 151.) It is thus not clear how much of the damage revealed in the MRI was pre-existing and how much was caused by the accident. For purposes of this case, however, the cause is not relevant.

[4]Specifically, the MRI report contains the following conclusions:

1. Small central and right lateral herniation of nucleus pulposis at C3-4 with minimal compression of the thecal sac.
2. Moderate sized osteophyte at C4-5 with moderate compression on the thecal sac and also causing moderate spinal canal stenosis.
3. Moderate neural foraminal stenosis at C4-5 and C5-6.
4. Solid anterior interbody fusion of C5, C6 and C7.

(R 155.)

Hillock then applied for disability benefits. Under the policy, there was a 180-day waiting period between the date of onset of the disability and the date benefits start. In this case, this period ran from February 27, 2001 through August 28, 2001. To qualify as disabled under this policy, Hillock is required to provide "objective medical findings" demonstrating that she is "continuously disabled" during this elimination period, which meant that she could not perform the "material and substantial duties" of her job.[5] If she is considered disabled, she will receive 60% of her monthly wages subject to coordination with her social security benefits. Such benefits would be paid until she either no longer satisfied the definition of "disability," died, or reached the age of 65.

Hillock's employer submitted her claim for long-term disability benefits to CNA on August 16, 2001. In support of her application, Hillock, her employer, and her primary care physician filled out forms required by CNA and submitted medical records. Hillock filled out a CNA form entitled LTD Employee's Statement and one entitled Employee's Job Activities Statement. (R 150, 158-59.) On the Employee's Statement, she indicated that she was injured in a car accident, suffered from spinal damage, and listed 5 physicians she had consulted about her condition: (1) Dr. Davis, (2) Dr. Nockles, (3) Dr. Cross, (4) Dr. Young, and (5) Dr. Sliwa. (R. 150.) On the Job Activities Statement, she stated: "severe headaches, neck & arm pain, [and] numbness occur throughout the work day, no matter what task is performed." (R 159.) She also estimated that a typical work day involved 7 hours sitting, 15 minutes standing, 30 minutes walking, and 30 minutes bending. (R 158.)

---

[5]There were a few other qualifications but they are not at issue here.

On the Employer's Job Activities Statement, which is similar to the employee's form, CF Industries stated that Hillock worked as an administrative assistant to the vice president of marketing and sales and that her job activities were as follows: "coordinates schedules, travel, handles phone, correspondence, files, office mgt." (R 156.) CF Industries also answered the question about Hillock's typical work day, stating that she spent 5 hours sitting, 2 hours standing, and 1 hour walking and that she spent 50% of her time working with other people. (*Id.*)

Dr. Davis completed the Physician's Statement, which is another form required by CNA. (R 151-52.) Dr. Davis listed under the diagnosis section that Hillock had chronic neck pain, myofascial pain, degenerative disc disease, and cervical fusion surgery. As for complications, Dr. Davis stated that Hillock suffered from chronic pain, poor posture, and poor mobility. (R 151.) In response to the physical limitations question, Dr. Davis indicated that Hillock was unable to lift any weight, cannot stand or sit for long periods of time, and that her concentration was affected secondary to pain. (R 152.) As for Hillock's prognosis, Dr. Davis stated that "prognosis is poor," that "[n]o further surgery will help," and that Hillock will "have significant pain for the rest of her life." (*Id.*) In addition to completing the Physician Statement, Dr. Davis also attached two MRI reports to substantiate these findings. (R 153-55.)

The initial review of the application was made by Lydia Myers, whose job title is "disability specialist." In addition to reviewing the materials cited above, Myers conducted a telephone interview with Hillock on September 7, 2001. In this interview, according to Myers' notes, Hillock stated that she has pain in her neck, shoulders, arms, and hands, has "almost constant" headaches, and has difficulty lifting her right arm. (R 139-41.) Hillock also stated that she was going to physical therapy since her accident in an effort to lessen her pain and that she

takes pain medication to be able to sleep at night. Myers also asked Hillock about her typical daily activities. Hillock stated that she did some gardening, grocery shopping, and a few other activities around the house like checking her email.

Five days later, in a September 12, 2001 letter, Myers informed Hillock that CNA had denied her claim for long-term disability benefits. This letter serves as the most comprehensive explanation for CNA's decision. We quote the substantive portion of this letter in full:

> Dr. Erin Davis states in the Physician's Statement that your complications/ symptoms are, "chronic pain, poor posture, poor mobility." Physical limitations noted by Dr. Davis include, "Patient unable to lift any weight. Cannot stand or sit for long periods of time. Concentration affected secondary to pain."
>
> According to the Employer and Employee Job Activities Statements, as an Administrative Assistant, you have the option of sitting or standing throughout the work day. No lifting or carrying is required. A headset is provided for telephone usage.
>
> According to the Employee Interview conducted with you on 09/07/01, you stated that your Activities of Daily Living consist of gardening, pulling weeds, watering the grass, cooking, grocery shopping, and light housework. You are able to care for your personal needs without difficulty. You are also able to take short walks, check email on your home compute[r], and sit up to 20 minutes at an interval.
>
> At this time, although we acknowledge that you have a condition, the information provided does not support that you are unable to perform the material and substantial duties of your occupation as an Administrative Assistant. The sit or stand option of your job would allow you to alternate positions as necessary. No lifting or carrying of any weight is required.

(R 132-133.)

Hillock subsequently asked CNA to reconsider the decision and submitted a letter objecting to, among other things, CNA's description of her typical daily activities. She also submitted additional medical evidence consisting of a report from Dr. Sliwa, an exercise physiologist, who examined her on one occasion in June 2001.

In a letter dated October 12, 2001, CNA denied Hillock's request for reconsideration, stating that it did not find any reason to alter its earlier analysis. As for the new report by Dr. Sliwa, CNA concluded that it indicated that Hillock had an "essentially normal physical examination." (R 124.)[6]

The claim was then forwarded to the Appeals Committee at CNA. Hillock again submitted additional information, which consisted of a letter from Dr. Whorton who worked as a medical consultant for CF Industries. (R 78-80.) In his November 13th letter, Dr. Whorton summarized Hillock's medical problems, her recurring pain, and her symptoms and concluded that she was incapable of performing her job due to "chronic pain." (R 80.)

In a letter dated November 30, 2001, the Appeals Committee denied Hillock's appeal. (R 67-69.) The Committee offered no new rationale for denying the claim and essentially relied on the reasoning in the September 12th letter. (R 67: "Based on our review of the available information we have no choice but to re-affirm the prior decision to deny benefits under the above captioned policy.") Having exhausted her administrative avenues of appeal under the plan, Hillock filed this action here.

---

[6]This letter was again signed by Myers. CNA now asserts, however, that this decision on reconsideration was actually made, behind the scenes in effect, by a nurse case manager named Tina Kevish.

## DISCUSSION

I. **Standard Of Review.**

A. **Which Standard Applies.**

The first task is to determine the appropriate standard of review. Hillock argues that review should be *de novo* while CNA argues that it should be under the arbitrary and capricious standard. This question hinges on whether the plan contained language specifically adopting the arbitrary and capricious standard; if not, the default standard is *de novo*. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The only issue here is whether we should look only at the plan in effect at the time Hillock became disabled (Feb. 28, 2001) or whether we should look at plan as it was later amended (May 1, 2001) after she became disabled but before she applied for benefits (Aug. 16, 2001). The parties agree on the consequences of this choice. If we are restricted to looking at only the plan without the later amendment, then review is *de novo*. If we look at the amended plan, then review is under the arbitrary and capricious standard.

Initially, this question was more complex. In their opening and response briefs, the parties cited to various cases, none of which clearly answered this question. However, before the parties filed their reply briefs, the Seventh Circuit provided a definitive answer. In *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771 (7th Cir. 2003), the Seventh Circuit held that "the controlling plan will be the plan that is in effect at the time a claim for benefits accrues." *Id.* at 774. Relying on *Hackett*, CNA asserts that the plan was amended before plaintiff's claim accrued. In her reply brief, Hillock does not disagree with this assertion. Accordingly, this case will be reviewed under the arbitrary and capricious standard.

B.     The Arbitrary and Capricious Standard.

Under the arbitrary and capricious standard, a decision will be upheld unless it is "completely unreasonable." *Mers v. Marriott Int'l Group Accidental Death & Dismemberment Plan*, 144 F.3d 1014, 1021 (7th Cir. 1998). Although this review is deferential, it should not be a "rubber stamp" and "deference need not be abject." *Hackett*, 315 F.3d at 774. The decision will not be upheld, for example, "when there is an absence of reasoning in the record to support it," *id.* at 774-75, or when the "record contains nothing more than scraps to offset the evidence presented by [the claimant]," *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 919 (7th Cir. 2003).

II.    Applying This Standard Here.

In denying Hillock's claim, CNA relied on two primary rationales that were set forth primarily in the September 12th letter. First, it concluded that her job allowed her to sit or stand as needed and that this flexibility made it possible for her to perform her job despite her medical problems. Second, it concluded that Hillock's ability to do some activities in her personal life, such as light gardening and housecleaning, further demonstrated that she could perform the material duties of her job.

A.     The Medical Evidence.

Before examining these rationales in more detail, it is important to note the various things CNA did not do. First, it never discussed the objective medical evidence submitted in support of plaintiff's claim. Second, with the possible exception of Dr. Sliwa's report, it never discussed the findings and opinions of five doctors who concluded that she was suffered from serious medical conditions. Two of these doctors – Drs. Davis and Whorton – specifically concluded

-8-

that she was disabled. Third, CNA did not hire a doctor to examine Hillock or even review her medical records. Instead, it relied principally on the analysis of an in-house administrative employee who insofar as the record reveals does not have any specialized medical training.

CNA thus did not directly challenge any of the medical evidence and proceeded under the assumption that Hillock did suffer from the medical conditions diagnosed by her doctors. These included spinal degeneration and damage, carpal tunnel syndrome, and postural abnormalities. In the original denial letter, for example, CNA addressed the medical evidence by merely stating in conclusory fashion that it acknowledged that Hillock had "a condition." (R. 133). CNA likewise proceeded under the assumption that Hillock did suffer from the various symptoms she and her doctors identified. (R 68: "We [] do not doubt your pain complaints.") These included chronic neck pain, myofascial pain, headaches, poor posture, poor mobility, numbness in the arms, inability to lift any weight, inability to sit or stand for long periods of time, and reduced concentration due to pain. *See, e.g.*, R 67-68. CNA also never disputed Hillock's claim that the pain she experienced was severe and constant. *Id.* at 68.

CNA's decision to completely ignore the objective medical evidence (which its own policy mandates must be submitted) and to ignore the opinion of Hillock's doctors as well as CNA's decision not to hire a doctor of its own to review this evidence raise strong doubts about the decision. *See, e.g., La Barge v. Life Ins. Co. of N. Am.*, 2001 WL 109527, *9 (N.D. Ill. Feb. 6, 2001) (administrator's decision lacked a "proper medical foundation" because it made no independent inquiry into claimant's condition, did not meet with claimant, and did not hire a physician to examine claimant). As CNA correctly points out in its brief, this is not a dispute between conflicting medical opinions. But even ignoring these problems, CNA's decision is still

unsupportable because it is based on unproven and unrealistic assumptions about the nature of Hillock's abilities and job duties.

### B. CNA's First Rationale.

The first rationale is that Hillock's job was flexible enough to accommodate her medical problems. This rationale rests on the assumption that Hillock had "the option of sitting or standing throughout the work day." (R 132.) According to the September 12th letter, this conclusion is derived from the two-page job activities form filled out by her employer. CF Industries indicated that she typically sat for 5 hours, stood for 2 hours, and walked for 1 hour. Based on this estimate, CNA concluded that Hillock could choose to sit or stand as needed during her work day and that she could arrange her work activities accordingly. However, the mere fact that she spent some portion of her day sitting and some portion standing does not automatically mean that she had the power to choose *when* she did these things.

This assumption is questionable based on what we know about the nature of her job, as revealed in the very same job activities statement relied upon by CNA. Hillock worked as an administrative assistant for the vice-president of marketing and sales. (R 156.) She coordinated schedules and travel, answered the phone, handled the files, managed the office, and did other related jobs. (*Id.*) Many of these tasks are time-dependent and cannot be put off to a time when a person is feeling better. Moreover, approximately half of her work day was spent working with other people, which would make it even more unlikely that she could work on her own time table. CNA's rationale is based on the assumption that the vice-president for whom Hillock worked would tailor any requests around Hillock's recurring need to change position every 10 or 20 minutes. In sum, while it is perhaps reasonable to assume that *some* of her job duties could be

-10-

done on an "as needed" basis, it is not reasonable to suppose (without any other evidence to back up the assertion) that *all* her job requests were of this type.

Even if Hillock had the option to sit or stand, it is not clear that this would have alleviated all her problems. CNA concluded, in effect, that Hillock's symptoms were intermittent and *only* occurred when she stood or sat for too long. But this point is not supported by any clear evidence. In fact, the evidence in the record strongly and consistently demonstrates that plaintiff suffered from constant pain – a fact CNA never questioned in any of its three letter decisions. For example, Hillock stated in the phone interview with Myers that she suffered from "almost constant" headaches. (R 139.) Every doctor Hillock consulted (including Dr. Sliwa) noted that she complained of constant and severe pain, which is also evidenced by the fact that she took two different painkillers on a regular basis. That she was in pain while at home, when she certainly could sit or stand as needed, also casts doubt on CNA's assumption that her pain only arose when she was confined to a single position for long periods of time. We recognize that both Hillock and her doctors indicated that she needed to change positions throughout the day. But this does not mean that changing positions eliminated all her pain rather than simply alleviated some of it. Finally, to the extent there is any doubt on this point, Hillock explicitly stated on the job activities form that her pain occurred "throughout the work day, *no matter what task is performed.*" (R 159; emphasis added.) CNA cited to this statement in its November 30th letter, but never expressed any doubt about it. (R 67.)

### C. CNA's Second Rationale.

CNA's second main rationale fares no better. CNA concluded that Hillock's ability to do some chores and activities while at home meant that she was fully capable of working an 8-hour job 5 days a week despite her medical conditions and pain.

As an initial matter, CNA overstated the amount and degree of her home-based activities. In the September 12th letter, CNA described Hillock's daily activities in a laundry list that makes it appear that she did all these activities easily and all in one day. Myers' own notes from this telephone conversation, however, indicate that Hillock's abilities were not as broad or frequent as portrayed in the letter. Although Hillock stated that she does gardening on occasion, she does so only from a sitting position. (R 140.) Although she does some grocery shopping, her husband goes with her and carries all the groceries. (*Id.*) Although she could get dressed, she still had difficulty pulling a shirt over her head and had to have a seat in the shower to assist her. (*Id.*)

The September 12th letter's description of her daily activities is also misleading to the extent that it suggests that the activities are all done on a single day. As Hillock made clear CNA in a letter sent after the initial decision, she could never do all these activities in one day but could only do one a day and then not more than two a week:

> Yes, there may be a day when I can sit on a stool in the garden and weed for 20/30 minutes; however, that is the extent of my physical activity for that day. I may be able to assist with dinner that evening, but more times than not, my husband and I revert to easily prepared meals. [] Your letter lists activity-after-activity, but I cannot perform more than one of those listed in your letter on any given day, and not more than two in any given week since the fall of 2000. There may be an afternoon when I can perform light housework, but no other activities occur the next day or perhaps several days thereafter.

(R. 126.) CNA never addressed this point in its subsequent letters, but Hillock's need to rest after doing these activities supports her claim that she is disabled and is inconsistent with CNA's portrayal of her as essentially normal.

In addition to aggressively characterizing the extent and frequency of her activities, CNA also assumed that the ability to do some activities at home by itself shows that a claimant can perform the material duties of her job. This assumption is not supported by the case law or common sense. *See, e.g., Pelchat v. UNUM Life Ins. Co.*, 2003 WL 21105075, *10 (N.D. Ohio May 12, 2003) ("whether plaintiff can complete light household chores is not determinative of whether she can perform her duties as a scheduler"). In *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914 (7th Cir. 2003), the Seventh Circuit specifically rejected this type of reasoning on both logical and philosophical grounds. First, as a matter of common experience, the Seventh Circuit concluded that the claimant's ability to do some activities at home did not establish that he could do a full-time job. The Court noted, for example, that "when one is working at home it is easier to interrupt one's work every few minutes if need be than to do so at the office." *Id.* at 918. Second, as a matter of fairness, the Seventh Circuit stated that a disabled person should not have to face the "unfortunate choice in life [] between succumbing to his pain and fatigue and becoming inert, on the one hand, and on the other hand pushing himself to engage in a certain amount of painful and fatiguing activity." *Id.* For these reasons, the Seventh Circuit concluded that engaging in a certain amount of activity at home simply "does not prove" that a person is not disabled. *Id.*[7]

---

[7]In fact, the Seventh Circuit went so far as to say that a claimant's ability to *work* full-time (much less do household chores) does not even prove that he is disabled. *Id.* at 918 ("A desperate person might force himself to work despite an illness that everyone agreed was totally

-13-

Following CNA's logic, Hillock should just take the energy used to do household chores and transfer that energy to work. While it may be possible that she could abstain during the work week from some of the listed activities, many of them must be done *in addition* to work activities. Personal grooming and cooking, for instance, are not things that one can reasonably choose to ignore, saving them up for the weekend. The relevant question then is whether her physical limitations and associated pain would have prevented her from doing *both* household activities and work activities. CNA never addressed this point.

### D. The Sliwa Report.

Although the above two rationales constitute CNA's explanation, CNA did later comment on the report of Dr. Sliwa, which was submitted after the original denial of Hillock's claim on September 12th. Specifically, in its October 12th letter, CNA explained why this report did not alter its earlier decision. CNA therefore did not affirmatively rely on this report as part of its rationale for rejecting this claim. However, to the extent that CNA may now be attempting to offer Dr. Sliwa's report as a third rationale for denying the claim, we will discuss it.

On June 18, 2001, Hillock was examined by Dr. Sliwa, who later prepared a 4-page report summarizing his findings. (R 112-15.) In its October 12th letter, CNA stated that the report "reveals [an] essentially normal examination." (R 124.) However, CNA's conclusion only makes sense if one selectively reads this report. Based on the statements CNA excerpted from the report, it appears that CNA simply went through the report and picked out every instance in which Dr. Sliwa noted that a particular body function was "normal" and ignored the many other contrary statements as well as the overall conclusions of the report.

---

disabling.").

A fair reading of the report shows that it contains a mixture of statements, some of which indicate normal functions in places but many other statements indicating that Dr. Sliwa concluded that Hillock suffered from "significant" or "decreased" limitations. The following paragraph is typical of the larger report:

> In a standing position, her shoulders, scapula, iliac crests and greater trochanters were symmetric. However, she had a significant disruption of normal anterior and posterior curvature. She had a posterior pelvic tilt, a decreased lumbar lordosis, a striking flattening of the thoracic spine, increased cervical lordosis with the head carried markedly interior. She could sidebend the fingertips approximately nine cm above the knee to the right and to the left, and flex with fingertips midway between the knees and the ankles.

(R 113.) As this passage illustrates, Dr. Sliwa observed that Hillock had a number of limitations, some of which were significant. But more probative than his specific observations are his overall conclusions and recommendations. He concluded unequivocally that Hillock suffered from myofascial pain, significant postural abnormalities, and significant limitations in the range of motion in the thoracic and lumbar spine. (R 114.) Moreover, he recommended that Hillock participate in pain therapy for these conditions. However, because he had not been able to review Hillock's MRI's, he could not make a firm diagnosis as to whether she should undergo further surgery and whether her pain therapy should be on an outpatient basis or in the pain program. (R 115.)[8] In any event, these are not recommendations you would expect from a doctor who believed that the patient was -- in CNA's words – "essentially normal."

---

[8] It is true that one of Dr. Sliwa's conclusions was that there was "[q]uestionable radiculopathy" (R 115) – a fact CNA pointed to in the October 12th letter. But this statement, which is tentative on its face, is based at least in part on the fact that Dr. Sliwa had not yet been able to review Hillock's MRI's or EMG's: "The patient did not have her MRI's or her EMG's with her today and we would need to view these to see if indeed, she would warrant a surgical opinion." (*Id.*)

### E. Case Law.

To summarize, we conclude that CNA's decision to deny Hillock long-term benefits under the policy is arbitrary and capricious because it is based on highly questionable assumptions and because it ignores the countervailing objective medical evidence.[9]

This conclusion is supported by the case law. For example, in the *Hawkins* case already discussed above, the Seventh Circuit held that the administrator arbitrarily and capriciously denied benefits to a man suffering from fibromyalgia (a condition very similar in nature to myofascial pain)[10] who claimed that this condition prevented him from working at a job "requir[ing] him to sit more or less all day at a computer, reading and typing." 326 F.3d at 916. Similar to CNA here, the administrator relied heavily on an "activities questionnaire," which stated that the claimant "has been taking classes in an effort to become a Web designer and that he surfs the Web for an hour or so at night and sometimes does some housework." *Id.* at 918. As discussed above, the Seventh Circuit rejected the argument that some home-based activities

---

[9]In coming to this conclusion, we have chosen not to rely on any treating physician rule (as advocated by plaintiff) nor have we given any deference to Social Security Administration's conclusion that Hillock is disabled (an argument also made by plaintiff) because we think that the result is justified without these presumptions and because it is unclear under the case law exactly what weight, if any, should be given to these facts. However, with regard to the issue of the SSA determination, we do make one observation. CNA repeatedly asserted in its briefs that it is unfair to consider the SSA's finding of disability because CNA was never given the materials relied upon by the SSA and was supposedly only told of the outcome. *See, e.g.*, CNA Opening Br. p. 14 ("The evidence considered by the SSA was not made available to [CNA]."). This statement appears to be contradicted, however, by CNA's November 30th letter, which explicitly states: "The information presented to the Social Security Administration by your treating doctors was taken into consideration." (R 68; *see also* R 87-108.)

[10]*See The Merck Manual of Medical Information* 250 (Home ed. 1997) ("The fibromyalgia syndromes (myofascial pain syndromes, fibromyositis) are a group of disorders characterized by achy pain and stiffness in soft tissues, including muscles, tendons (which attach muscles to bones), and ligaments (which attach bones to each other).").

disprove a disability. It also found that the medical report from a doctor hired by the administrator (something CNA did not even attempt to do here) was vague and failed to recognize that fibromyalgia is diagnosed primarily through subjective complaints of pain. *Id.* at 918-19. In the end, the Seventh Circuit stated that the record contains "nothing more than scraps" to offset the medical evidence presented by claimant and his physician. *Id.* at 919.[11]

Similarly, in *Houston v. Provident Life and Accident Ins. Co.*, 2002 WL 31779921 (N.D. Ill. Dec. 11, 2002) (J. Gottschall), the district court found that the administrator arbitrarily and capriciously denied benefits to a legal secretary who had cervical disc damage (as confirmed by MRI's) and unrelieved pain. *Id.* at *1-2. The court criticized the plan administrator for "[c]hoosing to rely on the only medical opinion that did not take into account the results of relevant, objective medical test results" and for "rely[ing] on parts of [a medical report] while simultaneously rejecting [its] overall conclusion." *Id.* at *7. Similarly here, CNA relied on selective excerpts from Dr. Sliwa's report while ignoring his overall conclusion that Hillock, at a minimum, suffered from myofascial pain and postural abnormalities. *Accord Pelchat*, 2003 WL 21105075 at *6, 10 (granting claimant's cross-motion for summary judgment under arbitrary and capricious standard because it was clear that plaintiff, who suffered from myofascial pain and cervical disc problems, could not perform a job that required her to sit for extended periods of time even though she was able to do "light housework, vacuum, dust, and gardening").

---

[11]The Seventh Circuit nonetheless described its decision as a "close call" due to the deferential nature of review under the arbitrary and capricious standard. *Id.* at 919.

-17-

## CONCLUSION

For the foregoing reasons, plaintiff's cross-motion for summary judgment is granted and defendant's cross-motion for summary judgment is denied. The parties are directed to appear at a status hearing at 2:30 p.m. on March 24, 2004 to determine how to resolve the remaining issues so that a final judgment may be entered.

ENTER:

JOHN A. NORDBERG
Senior United States District Court Judge

DATED: March 1, 2004